**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Nostalgic Partners LLC d/b/a Staten Island Yankees, Albuquerque Baseball Club LLC d/b/a Albuquerque Isotopes, Diamond Stadium Group LLC, Golden State Concessions & Catering Inc., Greenville Drive LLC, Lake Elsinore Storm LP, Long Ball Inc. d/b/a Spokane Indian Baseball Club, Northwest Baseball Ventures I LLC d/b/a Tri-City Dust Devils Baseball, Rancho Baseball LLC, Storm Events LLC, Storm Thredz LLC, 7th Inning Stretch LP d/b/a Delmarva Shorebirds,** | JURY TRIAL DEMANDED |
| Plaintiffs, | No:  20-cv-03346-JDW |
| v. | |
| **Philadelphia Indemnity Insurance Co.** | |
| Defendant. | |

<u>**FIRST AMENDED COMPLAINT**</u>

Plaintiffs Nostalgic Partners LLC d/b/a Staten Island Yankees, Albuquerque Baseball Club LLC d/b/a Albuquerque Isotopes, Diamond Stadium Group LLC, Golden State Concessions & Catering Inc., Greenville Drive LLC, Lake Elsinore Storm LP, Long Ball Inc. d/b/a Spokane Indian Baseball Club, Northwest Baseball Ventures I LLC d/b/a Tri-City Dust Devils Baseball, Rancho Baseball LLC, Storm Events LLC, Storm Thredz LLC, and 7th Inning Stretch LP d/b/a Delmarva Shorebirds (the "Teams"), by and through their undersigned attorneys, as and for their First Amended Complaint against Defendant Philadelphia Indemnity Insurance Co., allege as follows:

## INTRODUCTION

1.      In 2019, for the 15th straight year, more than 40,000,000 fans attended games played by 160 Minor League Baseball ("MiLB") teams located in smaller cities and communities throughout the United States. An excursion to the minor league ballpark has been a low-cost American family tradition for more than 100 years. This is the first year in that entire period of time—through prior pandemics, two world wars, and many other global and national crises—that those magic words, "Play Ball," will not be heard in any of the ballparks around the country in which minor league baseball is played.

2.      There are several causes of the first-ever cessation of Minor League Baseball in 2020. These causes include continuing concerns for the health and safety of players, employees, and fans related to the SARS-CoV-2 virus; action and inaction by federal and state governments related to controlling the spread of the virus; and Major League Baseball ("MLB") not supplying players to their affiliated minor league teams.

3.      The result of the cancellation of the MiLB season is catastrophic financial losses for all minor league teams, including the Plaintiff Teams.

4.      The operating model for MiLB teams is dependent on receiving players, coaches, and other team personnel from the MLB team with which they have an affiliation agreement requiring that MLB team to provide players and other personnel. It is also dependent on being permitted by federal, state, and local governments to allow the admission of the thousands of fans who flock to every minor league game to enjoy a ball game, partake in the entertainment and food and beverage amenities associated with the minor league baseball experience, and purchase baseball caps and other merchandise sold in the ballpark. Though some MiLB teams

have revenue from advertising, sponsorships, and non-baseball events, the teams' revenue is largely tied to the number of fans the team can attract to baseball games in a given year.

5.      The vast majority of MiLB teams' operating expenses, by contrast, bear little relationship to whether the teams are able to bring fans to the ballpark for ball games. The largest expense for many teams is the lease they pay to the municipal owners of the ballparks in which they play games. Most teams are responsible for a fixed lease payment of as much as one million dollars or more. In addition, MiLB teams generally have permanent employees needed to operate the team over an annual business cycle. The teams also have incurred many 2020 expenses related to marketing and advertising and the purchase and stocking of merchandise and food and beverage in preparation for the 2020 baseball season. Thus, on average, MiLB teams incur more than $2,000,000 in expenses to operate their teams without regard to whether they suffer interruption of their operations.

6.      Because of this business model, which requires variable revenue tied to attendance but significant fixed operating expenses, and the fact that most MiLB team owners are small business owners or family businesses rooted in the community in which they own a team, the teams have little prospect for economic survival if the operation of their businesses is interrupted for any significant period of time within a season. These dire economic consequences are worsened by the obligation many teams will have to refund ticket, event, advertising, and sponsorship revenue received in expectation that a full season of minor league baseball would be played in 2020.

7.      Given the business model for MiLB as described above, prudent owners of MiLB teams, including the Plaintiff Teams, purchased business-interruption insurance from their insurers and paid significant premiums to protect themselves from business interruption,

3

including the cancellation of games. The Teams each purchased nearly identical insurance policies providing such coverage from Defendant Philadelphia Indemnity Insurance Co. These "all risk" policies cover the Teams for business interruption in circumstances when, as here, there has been direct physical loss or damage, including, but not limited to, loss of use, to the Teams' ballparks or elsewhere caused by the SARS-CoV-2 virus, the attendant disease, the pandemic, the governmental responses to it, or the Teams' inability to obtain players. As described in detail below, however, Defendant Philadelphia Indemnity Insurance Co. has failed to meet its obligations to the Plaintiff Teams, thereby placing the Teams in serious risk of economic failure and jeopardizing the future of America's Pastime as we know it.

8.     The Teams thus bring this action against Philadelphia Indemnity Insurance Co. for breach of contract and a declaratory judgment that they are entitled to the full amount of coverage for which they paid premiums and which they badly need.

### THE PARTIES

9.     Plaintiff Nostalgic Partners LLC d/b/a Staten Island Yankees ("Staten Island Yankees")[1] is a limited liability company whose members are citizens of California, Colorado, Connecticut, Florida, Illinois, Massachusetts, Michigan, Ohio, and Texas. During the applicable period of loss, the Staten Island Yankees were insured by Philadelphia Indemnity Insurance Co. under Policy No. PHPK2043111.

10.     Plaintiff Albuquerque Baseball Club LLC d/b/a Albuquerque Isotopes ("Albuquerque Isotopes") is a limited liability company whose members are citizens of California, Colorado, Florida, Illinois, Michigan, Nevada, North Carolina, Tennessee, and

---

[1] Each Plaintiff owns and/or operates a minor league baseball team and is referred to herein by the name of that team.

4

Virginia. During the applicable period of loss, the Albuquerque Isotopes were insured by Philadelphia Indemnity Insurance Co. under Policy No. PHPK2110645.

11.     Plaintiff Greenville Drive LLC ("Greenville Drive") is a limited liability company whose members are citizens of South Carolina. During the applicable period of loss, the Greenville Drive were insured by Philadelphia Indemnity Insurance Co. under Policy No. PHPK2079457.

12.     Plaintiff Lake Elsinore Storm LP is a limited partnership whose partners are citizens of California. Plaintiff Golden State Concessions and Catering Inc. is a corporation organized under the laws of California with its principal place of business in California that provides services for Lake Elsinore Storm LP.  Plaintiffs Diamond Stadium Group LLC, Storm Events LLC, and Storm Thredz LLC are limited liability companies that provide services for Lake Elsinore Storm LP and whose members are citizens of California. During the applicable period of loss, Plaintiffs Lake Elsinore Storm LP, Golden State Concessions and Catering Inc., Diamond Stadium Group LLC, Storm Events LLC, and Storm Thredz LLC (collectively, "Lake Elsinore Storm") were insured by Philadelphia Indemnity Insurance Co. under Policy No. PHPK2091094.

13.     Plaintiff Long Ball Inc. d/b/a Spokane Indian Baseball Club ("Spokane Indians") is a corporation organized under the laws of Delaware with its principal place of business in Washington. During the applicable period of loss, the Spokane Indians were insured by Philadelphia Indemnity Insurance Co. under Policy No. PHPK2077633.

14.     Plaintiff Northwest Baseball Ventures I, LLC d/b/a Tri-City Dust Devils ("Tri-City Dust Devils") is a limited liability company whose members are citizens of Kansas, New

York, and Washington. During the applicable period of loss, the Tri-City Dust Devils were insured by Philadelphia Indemnity Insurance Co. under Policy No. PHPK2077633.

15.     Plaintiff Rancho Baseball, LLC d/b/a Rancho Cucamonga Baseball Club ("Rancho Cucamonga Quakes") is a limited liability company whose members are citizens of California, Idaho, Kansas, North Carolina, and Washington. During the applicable period of loss, the Rancho Cucamonga Quakes were insured by Philadelphia Indemnity Insurance Co. under Policy No. PHPK2077633.

16.     Plaintiff 7th Inning Stretch LP d/b/a Delmarva Shorebirds ("Delmarva Shorebirds") is a limited partnership whose partners are citizens of California, Maryland, and Texas. During the applicable period of loss, the Delmarva Shorebirds were insured by Philadelphia Indemnity Insurance Co. under Policy No. PHPK2113479.

17.     Defendant Philadelphia Indemnity Insurance Co. ("Philadelphia") is a corporation organized under the laws of Pennsylvania with its principal place of business at One Bala Plaza, Suite 100, Bala Cynwyd, PA 19004.

## JURISDICTION AND VENUE

18.     Because the Parties are completely diverse of citizenship and because the amount in controversy exceeds $75,000, this Court has subject matter jurisdiction over this action. *Cf.* 28 U.S.C. § 1332(a).

19.     Because Defendant is incorporated under the laws of Pennsylvania and maintains its principal place of business therein, the Court has general personal jurisdiction over Defendant with respect to these claims.

20.     Because Defendant's principal place of business is within this judicial district, and because Defendant thus resides therein, venue in this Court is proper. *Cf.* 28 U.S.C. § 1391(b), (d).

## FACTUAL ALLEGATIONS

**I.      THE NATURE OF THE COVID-19 PANDEMIC**

21.     COVID-19 is an infectious disease caused by a recently discovered novel coronavirus, formally known as SARS-CoV-2. The first instances of the disease were diagnosed in China in or around December 2019, and the first reported case in the United States was in January 2020.

22.     The impact of the virus and the resulting pandemic on life and property has been staggering. Though testing has been severely limited, as of the filing date of this Complaint, more than 5,100,000 Americans have had confirmed cases of COVID-19, and more than 160,000 have died from it.

23.     The virus is easily transmitted from person to person, person to surface, and surface to person. According to the World Health Organization (the "WHO"), the virus can spread from person to person and to surfaces through small droplets from the nose or mouth that are spread when a person with COVID-19 coughs or exhales, and small droplets from the nose or mouth land on objects and surfaces around the person. Other people then catch the virus by touching these objects or surfaces, then touching their eyes, noses, or mouths.[2]  People can also catch the virus if they breathe in droplets from a person infected with the virus who coughs or exhales droplets.

---

[2] *Q&A on Coronaviruses (COVID-19)*, World Health Organization (April 17, 2020), https://www.who.int/news-room/q-a-detail/q-acoronaviruses.

24.     Infected individuals can be completely asymptomatic—and thus unaware that they might be spreading the virus through the mere touching of objects and surfaces. Indeed, studies have estimated that more than 40% of infected individuals may never develop any symptoms.[3] But even individuals who appear healthy and present no identifiable symptoms of the disease might still spread the virus by breathing, speaking, or touching objects and surfaces.

25.     According to a report in *The New York Times*, "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one infectious cough."[4] And one human sneeze can expel droplets that can travel up to 27 feet at nearly a hundred miles an hour.[5]

26.     Although these droplets are small, they are physical objects that travel and attach to surfaces and cause harm.

27.     It is statistically certain the virus has been present at the Teams' ballparks for some period of time since their closures. Current evidence suggests that SARS-CoV-2 remains viable for hours to days on surfaces made from a variety of materials.[6] The virus can survive and remain virulent on stainless steel and plastic for 3 to 6 days, on glass and banknotes for 3 days, and on wood and cloth for 24 hours.[7] Testing of similar viruses suggests that SARS-CoV-2 can survive on ceramics, silicon, and paper for at least 5 days. And the Centers for Disease Control

---

[3] Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected* (May 27, 2020, 12:43 PM), https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-may-be-more-common-suspected-n1215481.

[4] *See* Yuliya Pashina-Kottas et al., *This 3-D Simulation Shows Why Social Distancing Is So Important*, N.Y. Times (April 21, 2020), https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html.

[5] Sarah Gibbens, *See How a Sneeze Can Launch Germs Much Farther than 6 Feet*, Nat'l Geographic (April 17, 2020), www.nationalgeographic.com/science/2020/04/coronavirus-covid-sneeze-fluid-dynamics-in-photos/.

[6] *Cleaning and Disinfection for Community Facilities*, Centers for Disease Control and Prevention (May 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/cleaning-disinfection.html.

[7] Letter from Neeltje van Doremalen et al. to N. Eng. Journal of Med. (April 16, 2020), available at https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973.

(the "CDC") confirmed that the virus was identified on surfaces of the *Diamond Princess* cruise ship a full 17 days after the cabins were vacated.[8]

28.     Though the ballparks have been closed to the public for baseball since March 2020, persons entered the stadiums in the weeks and months before their closures to prepare for the upcoming baseball season. Further, Team employees are permitted within the stadiums through the present. Some Teams, moreover, continue to host limited non-baseball events within the stadiums. Given the number of confirmed COVID-19 cases in the United States has surpassed 5 million, it is statistically certain that the virus has been carried into each of the stadiums.

29.     Without a vaccine to protect against COVID-19, effective control of the pandemic relies on measures designed to reduce human-to-human, human-to-surface, and surface-to-human exposure. The CDC has stated that the virus can spread when people are within 6 feet of each other, or when a person comes into contact with a surface or object that has the virus on it.

30.     The nature of the virus has caused authorities around the country to issue stay-in-place orders to protect persons and property, and many such orders observe the virus's threat to property. Indeed, authorities in each of the Teams' respective states have issued such orders.

31.     In California, home to the Rancho Cucamonga Quakes and Lake Elsinore Storm, Governor Gavin Newsom issued Executive Order N-33-20 on March 19, 2020, pursuant to which all non-essential businesses were closed and Californians were ordered to stay home and permitted to leave only for groceries, medicine, exercise, and to perform essential jobs. As non-essential businesses, the Rancho Cucamonga Quakes and Lake Elsinore Storm were forced to close their stadiums for baseball games.

---

[8] *Public Health Responses to COVID-19 Outbreaks on Cruise Ships—Worldwide, February–March 2020*, Centers for Disease Control and Prevention (March 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm.

32.     In New York, home to the Staten Island Yankees, Governor Andrew Cuomo issued the "New York State on PAUSE" executive order, effective March 22, 2020 at 8 p.m., pursuant to which all non-essential businesses statewide were closed. All non-essential gatherings of individuals of any size for any reason were cancelled, and New Yorkers were permitted only to leave their homes for groceries, medicine, exercise, and to perform essential jobs. As a non-essential business, the Staten Island Yankees were forced to close their stadium for baseball games.

33.     In New Mexico, home to the Albuquerque Isotopes, Secretary of the Department of Public Health, Kathyleen Kunkel, issued a public health order, effective March 24, 2020, pursuant to which all non-essential businesses were ordered closed and to which all New Mexico citizens were advised to stay at home and to undertake only those outings absolutely necessary for their health, safety, or welfare. As a non-essential business, the Albuquerque Isotopes were forced to close their stadium for baseball games.

34.     In Washington, home to the Spokane Indians and Tri-City Dust Devils, Governor Jay Inslee issued a statewide stay-at-home order effective March 25, 2020 at 12 a.m. Pursuant to this order, all non-essential businesses were closed and residents were ordered to stay home and permitted to leave only for groceries, medicine, exercise, and to perform essential jobs. As non-essential businesses, the Spokane Indians and Tri-City Dust Devils were forced to close their stadiums for baseball games.

35.     In Maryland, home to the Delmarva Shorebirds, Governor Larry Hogan issued a statewide stay-at-home order effective March 30 at 8 p.m. Pursuant to this order, all non-essential businesses were closed and residents were ordered to stay home and permitted to leave

only for groceries, medicine, exercise, and to perform essential jobs. As a non-essential business, the Delmarva Shorebirds were forced to close their stadium for baseball games.

36.     In South Carolina, home to the Greenville Drive, Governor Henry McMaster issued Executive Order No. 2020-17, effective April 1, 2020 at 5 p.m., pursuant to which non-essential businesses were forced to close, and Executive Order No. 2020-21, effective April 7, 2020 at 5 p.m., pursuant to which all residents and visitors of South Carolina were ordered to stay home and permitted to leave only for groceries, medicine, exercise, and to perform essential jobs. As a non-essential business, the Greenville Drive were forced to close their stadium for baseball games.

37.     Authorities throughout the country have issued similar orders due to the uncontrolled spread of the virus.

38.     For these reasons, it is statistically certain that the virus is present at the Teams' ballparks and/or nearby properties or that the virus poses an actual and imminent threat to the ballparks. Moreover, the ballparks are incapable of their intended function—serving as a venue for ball games attended by fans.

39.     The nature of the virus, including its continuing, damaging, and invisible presence, and the measures required to mitigate its spread, constitute an actual and imminent threat, and direct physical loss or damage to the ballparks (as well as the areas surrounding them) and has contributed to cancellations of the Teams' MiLB games.

## II.     GOVERNMENTS' RESPONSES TO THE PANDEMIC

40.     On December 31, 2019, the Chinese government notified the WHO of a "pneumonia of unknown cause" discovered in China's Wuhan province. On January 3, 2020, the U.S. federal government received its first formal notification of the outbreak in China. The United States reported its first COVID-19 case on January 20, and on January 30, the WHO

declared the COVID-19 pandemic a "Public Health Emergency of International Concern." Yet in the first few months of 2020, the federal government failed to recognize the severity of the pandemic and did not contain the virus.

41.     By the beginning of February, 11,000,000 people in China's Wuhan province were under quarantine, and the extent of the transmission was clear. Aside from limiting travel from Wuhan, however, the federal government took little action. Even though funding and medical equipment were being depleted by the day, the federal government did not authorize new funds or require the production of testing kits, ventilators, or personal protective equipment for healthcare workers.

42.     In February, the virus spread throughout the United States largely undetected. Though the CDC began shipping testing kits to laboratories on February 5, the kits were later determined to be flawed, rendering the tests unreliable. By February 26, the CDC were still testing fewer than 100 patients daily, notwithstanding that the CDC were telling state and local officials that their testing capacity was more than adequate to meet current testing demands.

43.     On March 13, 2020, the federal government declared a national emergency. Three days later, the CDC and members of the national Coronavirus Task Force issued public guidance, styled as "30 Days to Slow the Spread," that advocated for the first time far-reaching social-distancing measures, such as working from home; avoiding shopping trips and gatherings of more than 10 people; and staying away from bars, restaurants, and food courts.

44.     The failure of the federal government to build an effective wall preventing the continued migration of the virus from states that were hit early to the rest of the country meant that states took the lead in combating the virus's spread. State after state, including the states identified above, imposed sweeping restrictions on citizens' daily lives to protect them and stop

the spread, including the restrictions referenced in paragraphs 31 through 36, and continue to do so.[9] Most states restricted or prohibited the operation of non-essential businesses, prohibited public gatherings, or required individuals to stay at home except for essential purposes.

45.     According to a Columbia University study, if the government had imposed social-distancing measures just one week earlier—on March 8 instead of March 15—the United States would have avoided 703,975 confirmed cases (62%) and 35,927 reported deaths (55%) as of May 3.[10] And if social distancing and lockdowns had begun just two weeks earlier—on March 1—the country would have seen a reduction of 960,937 (84%) cases and 53,990 (83%) deaths.

46.     The governmental responses to the virus are a cause of direct physical loss or damage at the ballparks (as well as the areas surrounding them) and a cause of the Teams' business interruptions.

## III.     MAJOR LEAGUE BASEBALL DOES NOT PROVIDE PLAYERS

47.     Fans come to MiLB baseball games to see the players. But the Teams do not employ or manage the baseball players who draw fans to the park. Rather, Major League Baseball teams supply the players to each Team through player development contracts.

48.     Each Team manages the business aspects of its operations, such as marketing and promotions and sales of tickets, parking, advertising, concessions, and merchandise. But under the player development contracts, the parent Major League Baseball club manages the players, including by paying their salaries and by determining which teams they play for and when.

49.     The Teams' players are thus under the exclusive control of the parent club, which determines which players the Team receives and, indeed, whether it receives any players at all.

---

[9] Jasmine C. Lee et al., *See How All 50 States Are Reopening (and Closing Again)*, N.Y. Times (updated July 31, 2020), https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html.

[10] Jeffrey Shaman et al., *Differential Effects of Intervention Timing on COVID-19 Spread in the United States*, MedRxiv (May 29, 2020), https://www.medrxiv.org/content/10.1101/2020.05.15.20103655v2.full.pdf+html.

50.     The Professional Baseball Agreement entered into between Major League and Minor League Baseball and the Player Development Contract between MLB and MiLB teams set forth obligations of the MLB teams to supply players to the MiLB teams. Pursuant to those agreements, MLB teams were to provide players to MiLB teams to enable the start of the MiLB season in early-April 2020. However, MLB has informed MiLB that it will not be providing MiLB with players for the 2020 season. As a result, MiLB's 2020 season has been cancelled.

51.     MLB not supplying players to the Teams caused direct physical loss or damage at the ballparks and is a cause of the Teams' business interruptions.

## IV.     THE TEAMS SUFFER BUSINESS-INCOME LOSSES

52.     As a result of the virus, attendant disease, resulting pandemic, governmental responses, and MLB not supplying players, the Teams have been deprived of their primary source of revenue—fans coming to the ballpark and paying for game tickets, merchandise, and food and beverage and partaking in other amenities—and other revenue sources. Though some MiLB teams have revenue from advertising, sponsorships, and non-baseball events, revenue is largely tied to the number of fans the team can attract to baseball games in a given year.

53.     2019, for example, was a stellar year for MiLB. More than 40,000,000 fans attended such games, marking the 15th consecutive season that MiLB's teams drew more than 40,000,000 fans. The 2019 season also marked MiLB's largest year-over-year increase in attendance since the 2006 season and marked the 9th-largest single-season total in MiLB's history.

54.     This year, however, there are no games and no fans. As such, the Teams' primary income streams have come to a halt. Yet the fixed costs of operating a baseball stadium remain, such as fixed lease payments and payroll for permanent employees needed to operate the team over an annual business cycle.

55.     The Teams have therefore suffered, and will continue to suffer, significant business-income losses, expenses, and damages in a number of forms, including, but not limited to:

      a.  Loss of or diminished ticket sales;

      b.  Loss of or diminished parking sales;

      c.  Loss of or diminished concessions sales;

      d.  Loss of or diminished merchandise sales;

      e.  Loss of or diminished advertising sales;

      f.  Loss of or diminished sales for other events, such as concerts;

      g.  Loss or diminished rent.

56.     The Teams have incurred, and will continue to incur, further losses, expenses, and damages in the form of normal operating expenses, including, but not limited to, lease payments and payroll costs.

57.     The Teams' ballparks are within one mile of locations that have also suffered direct physical loss or damage to property arising out of the pandemic.

58.     With no players, no games, and no fans, the Teams' losses of business income for the 2020 MiLB baseball season have been near total. With virtually no source of income, and accruing expenses, the Teams face catastrophic financial losses.

## V.     THE POLICIES PROVIDE COVERAGE

59.      In exchange for substantial premiums, Philadelphia sold the policies covering the Teams as the named insureds (the "Policies").

60.     The Policies are substantively identical. Each is a commercial all-risk first-party property & casualty policy with identical grants of coverage for "business income" losses. To simplify presentation of the coverage disputes at issue in this suit, the Teams set forth relevant

15

provisions of the policy of Greenville Drive LLC (the "Policy"), attached as **Exhibit A**. The
nearly identical policies of the Staten Island Yankees, Albuquerque Isotopes, Lake Elsinore
Storm, Spokane Indians, Tri-City Dust Devils, Rancho Cucamonga Quakes, and Delmarva
Shorebirds are attached as **Exhibits B–G**.

61.     The Policy's period of coverage is from December 31, 2019 to December 31,
2020. Ex. A at 10.[11]

62.     The Policy provides coverage per occurrence. Ex. A at 231.

63.     The Policy is divided into, among other types of coverage, a "Property Coverage
Form," Ex. A at 177–200, and a "Business Income with Extra Expense Coverage Form," Ex. A
at 227–39.

64.     The Property Coverage Form covers "direct physical **'loss'**[12] to Covered
Property[13] caused by or resulting from any of the Covered Causes of Loss."[14] Ex. A at 177.

65.     The limit of insurance applies per occurrence. Ex. A at 190-91.

66.     The Property Coverage Form provides "Additional Coverages." Ex. A at 180–85.

---

[11] Staten Island Yankees (October 1, 2019 to October 1, 2020); Albuquerque Isotopes (March 19, 2020 to March 19, 2021); Lake Elsinore Storm (January 28, 2020 to January 28, 2021); Spokane Indians, Tri-City Dust Devils, and Rancho Cucamonga Quakes (January 1, 2020 to January 1, 2021); and Delmarva Shorebirds (March 30, 2019 to March 30, 2020 and March 30, 2020 to March 30, 2021). The Albuquerque Isotopes were also covered under an all-risk property & casualty policy with business income coverage issued by Philadelphia for the period of March 19, 2019 through March 19, 2020).

[12] "**'Loss'** means accidental loss or damage." Ex. A at 200.

[13] "Covered Property" means, among other things, the "buildings or structures" described in the declarations. Ex. A at 177–79, 199.

[14] "**Covered Causes of Loss** means Risks of Direct Physical Loss unless the **'loss'** is:

1. Excluded in Section **B., Exclusions**; or

2. Limited in Section **C., Limitations**;

that follow."

Ex. A at 180, 201.

67.     The Business Income with Extra Expense Coverage Form covers "the actual loss of Business Income [the policyholder] sustain[s] due to the necessary suspension of [the policyholder's] **'operations'** during the **'period of restoration'**. The suspension must be caused by direct physical **'loss'** to property at the premises described in the Declarations, or within 1000 feet of the premises, caused by or resulting from any of the Covered Causes of Loss." Ex. A at 227–28.

68.     "Business Income means the: **a.** Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and **b.** Continuing normal operating expenses incurred, including payroll." Ex. A at 228.

69.     The Business Income with Extra Expense Coverage Form provides "Additional Coverages." Ex. A at 228–31.

70.     The Additional Coverages include certain Extra Expenses. "Extra Expenses means necessary expenses [the policyholder] incur[s] during the **'period of restoration'**[15] that [the policyholder] would not have incurred if there had been no direct physical **'loss'** to property caused by or resulting from any of the Covered Causes of Loss." Ex. A at 228.

71.     The Additional Coverages include "the actual loss of Business Income [the policyholder] sustain[s] and necessary Extra Expenses [the policyholder] incur[s] caused by

---

[15] "**Period of Restoration'** means the period of time that

**a.** Begins:

**(1)** 72 hours after the time of direct physical **'loss'** for Business Income coverage; or

**(2)** Immediately after the time of direct physical **'loss'** for Extra Expense coverage; and

**b.** Ends on the earlier of:

**(1)** The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

**(2)** The date when business is resumed at a new permanent location."

Ex. A at 238.

action of Civil Authority that prohibits access to the described premises due to direct physical **'loss'** to property other than at the described premises caused by or resulting from any of the Covered Causes of Loss." Ex. A at 228–29.

72.     The Additional Coverages include "the actual loss of **'Rental Value'**[16] [the policyholder] incur[s] during the period." Ex. A at 230.

73.     The Policy purports to exclude from coverage "loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Ex. A at 40 (the "Exclusion").  The Exclusion does not preclude the Teams' claims for coverage here because, among other reasons, it is not included in the policy, inapplicable, or unenforceable. Nor does any other policy provision exclude the Teams' claims for coverage.  Notably, the Staten Island Yankees' policy does not contain the Exclusion.

## VI.     THE INSURER DENIES THE TEAMS' CLAIMS FOR COVERAGE

74.     All Teams have made claims for coverage with Philadelphia under the Policies.

75.     In April 2020, Philadelphia denied the Staten Island Yankees' claim for coverage on various inapplicable grounds, including that the Team's losses do not result from direct physical loss or damage to property.

---

[16] "**'Rental Value'** means:

**a.** Total anticipated rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by [the policyholder]; and

**b.** Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be [the policyholder's] obligations; and

**c.** Fair rental value of any portion of the described premises which is occupied by [the policyholder]." Ex. A at 239.

76.    On May 8, 2020 Philadelphia denied the Lake Elsinore Storm's claim for coverage on various inapplicable grounds, including that the Team's losses (1) do not result from direct physical loss or damage to property and (2) are barred by the Exclusion.

77.    On May 19, 2020, Philadelphia denied the Greenville Drive's claim for coverage on various inapplicable grounds, including that the Team's losses (1) do not result from direct physical loss or damage to property and (2) are barred by the Exclusion.

78.    On June 15, 2020, Philadelphia denied the Delmarva Shorebirds' claim for coverage on various inapplicable grounds, including that the Team's losses (1) do not result from direct physical loss or damage to property and (2) are barred by the Exclusion.

79.    On July 29, 2020, Philadelphia denied the Spokane Indians' claim for coverage on various inapplicable grounds, including that the Team's losses (1) do not result from direct physical loss or damage to property and (2) are barred by the Exclusion.

80.    On July 29, 2020, Philadelphia denied the Tri-City Dust Devils' claim for coverage on various inapplicable grounds, including that the Team's losses (1) do not result from direct physical loss or damage to property and (2) are barred by the Exclusion.

81.    On July 29, 2020, Philadelphia denied the Rancho Cucamonga Quakes' claim for coverage on various inapplicable grounds, including that the Team's losses (1) do not result from direct physical loss or damage to property and (2) are barred by the Exclusion.

82.    On August 11, 2020, Philadelphia denied the Albuquerque Isotopes' claim for coverage on various inapplicable grounds, including that the Team's losses (1) do not result from direct physical loss or damage to property and (2) are barred by the Exclusion.

83.    Philadelphia's positions denying coverage to the Teams are baseless. As set forth herein, there has been direct physical loss or damage, including, but not limited to, loss of use at

the Teams' ballparks and elsewhere caused by the SARS-CoV-2 virus, the governmental responses to the SARS-CoV-2 virus, or the Teams' inability to obtain players. Moreover, the Exclusion does not defeat the Teams' claims for coverage because, among other reasons, it is not included in the policy, inapplicable, or unenforceable.

   A.   **Before 2006, courts had held that virus-like substances were covered.**

84.   Most U.S. states require the filing of insurance policy forms and provisions. Rating organizations such as the Insurance Services Office ("ISO") and the American Association of Insurance Services ("AAIS") have filed and do file insurance policy forms on behalf of their members, their subscribers, and those who use the approved forms.

85.   The state insurance commissioners are responsible for approving proposed insurance policy language and rates and thereby protecting the interests of the insurance-buying public. The commissioners act as the agents of the states' policyholders because the commissioners are charged by statute to protect the interests of policyholders and to ensure that insurance companies provide reasonable, equitable, and fair treatment to the public.

86.   The ISO Virus or Bacteria Endorsement was introduced by the insurance industry in 2006, and industry representatives from ISO and AAIS sought and obtained approval for their new endorsements from state insurance regulators, but this was not done in a vacuum. Prior to that time, many courts, insurers, and policyholders had interpreted then-existing exclusions in property and casualty insurance policies for "pollutants" or "contaminants" as not excluding insurance coverage for property damage, bodily injury, and various other losses resulting from virus-like substances. Nevertheless, the insurance industry falsely told state insurance regulators in 2006 that contamination of property with "disease-causing agents" was not covered by property insurance policies and the new exclusion was a mere "clarification" of existing coverage, a demonstrably false statement.

20

87.     In fact, before introduction of the ISO Virus or Bacteria Endorsement in 2006, the threat of or the actual presence of a deadly virus or bacteria on property was well understood to constitute physical loss of or damage to that property, and property damage was generally understood to occur in a variety of circumstances where property is rendered unusable for its intended purpose—even if the bricks or mortar of the property have not been harmed.

88.     For fifty years, a strong majority of courts interpreting property and business income insurance policies had concluded that physical loss of or damage to property includes conditions that render property unusable.[17]

89.     Before 2006, based on judicial opinions in numerous civil actions across the United States, insurers were aware insured property damage and resulting business income loss and extra expenses could be caused by an array of noxious and untenable conditions impacting property, including the following:

    a.     Infusion of a factory with radioactive dust and radon gas;

    b.     The presence of carbon monoxide, pollutants, asbestos or lead in buildings;

    c.     The occurrence of vibrations that cause equipment to shut down without being damaged;

    d.     The malicious addition of chemicals to a sewage plant that destroy a bacteria colony;

    e.     The contamination of a well with E. coli bacteria;

    f.     The spread of dust, soot and smoke through a law firm as a result of 9/11;

---

[17] *See, e.g.*, *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 16–17 (W. Va. 1998) (holding there was coverage when continued occupancy of the policyholder's home was rendered dangerous by the presence of falling rocks); *Hughes v. Potomac Ins. Co.*, 18 Cal. Rptr. 650, 655 (Cal. Ct. App. 1962) (holding there was coverage when the policyholder's home, which had become perched on the edge of a cliff after a sudden landslide caused a large chunk of the ground surrounding the property to fall into a creek (thus depriving the home of lateral support and stability));

g.     The fumigation of otherwise undamaged food beans with a substance not acceptable to customers in the United States market;

h.     The production of "off-tasting" soda that had not been rendered unfit for human consumption;

i.     The impact of odor in a house from an illegal methamphetamine lab;

j.     Exposures of meat, cardboard food containers and other products to ammonia, smoke and pesticides; and

k.     Infestation of a house with brown recluse spiders.

90.     As these and similar examples demonstrate, insurers have long been aware that an event like the presence or suspected presence of the SARS-CoV-2 virus in a building or area that makes property too dangerous to use as it was designed to be used, causes direct physical loss of or damage to that property. Like other temporary and permanent conditions that make property too dangerous to use, the presence or suspected presence of a dangerous virus on property or in property elsewhere in the vicinity constitutes "direct physical loss of or damage."

91.     Insurance company submissions to state insurance regulators demonstrate that insurers worldwide were aware of this truth when they told such regulators the opposite—just as they are now telling courts and impacted policyholders like the Teams.

92.     At the time the ISO Virus or Bacteria Endorsement was introduced by the insurance industry in 2006, the insurance industry had previously been reprimanded and estopped from enforcing exclusions by numerous courts across the country for publicly misrepresenting to insurance regulators and policyholders that "pollution" exclusions introduced in standard-form comprehensive general liability policies in 1970 were not reductions in coverage, but merely "clarifications" for which no rate change would be required.

93.     Similarly, contrary to regulatory representations, when insurers attempted to apply even broader exclusions introduced in the 1980's to risks other than traditional

environmental contamination, many courts judicially estopped the insurers from applying the exclusions in contradiction of their false statements to state insurance regulators.

94.    Despite this history of misrepresentations by ISO to states' insurance regulators about exclusions introduced with no rate change that were misleadingly termed as "clarifications," as described below, the insurance industry led by ISO made similar misrepresentations in 2006 to obtain approval for the ISO Virus or Bacteria Endorsement to the standard commercial property insurance form.

95.    As with similarly-deceptive efforts to approve earlier pollution and contamination exclusions in 1970 and 1985, this was largely accomplished through filings with state insurance regulators by the leading insurance industry trade groups that insurers use to share rates and loss information and develop regulator-approved, standardized policy forms.

**B.    Insurers deceive state insurance regulators on the law.**

96.    In 2006, the ISO and the AAIS represented thousands of members and subscribing insurers in seeking regulatory approval in each state for new virus or bacteria exclusions, while some individual insurers submitted their own broader or narrower wordings for approval. These organizations sought approval from each of the state insurance regulators for new exclusions referencing "virus" and "disease-causing agents," including the ISO Virus or Bacteria Endorsement attached to the Policies here,[18] all while representing falsely that the exclusions would not reduce coverage.

97.    The insurance industry wanted these new standard-form exclusions because previous exclusions relating to pollution or contamination made no reference to disease-related causes of loss—a fact the insurance industry became aware of during the Severe Acute

---

[18] As previously explained, the Staten Island Yankees have no such exclusion.

Respiratory Syndrome (SARS) epidemic. As a result, the insurance industry sought to exclude coverage for virus and disease-causing agents for the first time in 2006, while knowingly or recklessly and incorrectly telling regulators and policyholders these causes of loss were not covered anyway.

98.     A comparison of the ISO and AAIS filings reveals that the insurance industry deceived the regulators as to the nature of the exclusions for which they sought approval, including the ISO Virus or Bacteria Endorsement, and proves the Teams' claims were wrongfully denied by the Insurer.

99.     The largest insurer trade group, ISO, led the way in the regulatory approval effort by submitting an ISO Circular to explain the newly proposed exclusion for virus and disease-causing agents on July 6, 2006.

100.     ISO's Circular was filed in relation to the proposed Endorsement CP 01 40 07 06—Exclusion Of Loss Due To Virus Or Bacteria—the same ISO Virus or Bacteria Endorsement now attached to the Policies. The substance of the ISO Circular states as follows, emphasis added:

> **<u>Introduction</u>**
>
> The current pollution exclusion in property policies encompasses contamination (in fact, uses the term contaminant in addition to other terminology). Although the pollution exclusion addresses contamination broadly, viral and bacterial contamination are specific types that appear to warrant particular attention at this point in time.
>
> . . .
>
> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business

interruption (time element) losses.

**Current Concerns**

. . .

*While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent.* In light of these concerns, we are presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms.

101.    It simply was not true for ISO or AAIS or other insurers to assert in 2006 that property insurance policies were not sources of recovery for policyholders that suffered losses involving disease-causing agents like virus, mold, or bacteria, and it was not true to assert these policies were never intended to be sources of recovery for these losses. As individual insurers admitted in their own filings, the existence of coverage the ISO insurers were newly excluding had already been confirmed by the courts long before and was part of the risks all property insurers previously contemplated when writing coverage, which policyholders reasonably expect and would never willingly part with.

102.    As noted above, by 2006, insurers were well aware their property insurance policies had been found to cover a variety of claims involving disease-causing agents. The cases putting the industry "on notice" are legion, span decades, and involve E. coli bacteria; radioactive dust; noxious air particles; asbestos; mold; mildew; "health-threatening organisms"; vaporized agricultural chemicals; pesticides; and other harmful conditions that impact property or make it unfit for use.

103.    The insurance industry had motives to deceive insurance regulators on this point in 2006, just as it did when similar deceptions were made in 1970 and 1985: the insurance industry wanted to exclude an existing exposure without critical attention being paid by regulators—the only persons who can negotiate meaningfully with insurers about standard-form policy language—and the insurers also wanted to avoid an enforced reduction in premiums or rates.

104.    As a result of the ISO and other insurers' deception and misrepresentations, state insurance regulators approved the ISO Virus and Bacteria Endorsement for use on commercial property and business income policies, and the ISO Virus or Bacteria Endorsement was attached to the Policies issued to the Teams.

105.    The insurance industry, including the Insurer in this suit, benefited from the representations and omissions to the state insurance regulators about the ISO Virus or Bacteria Endorsement by improperly maintaining pre-existing premiums for what the insurance industry and the Insurer now contend was substantially reduced property and business income insurance coverage from what previously existed.

106.    The insurance industry, including the Insurer in this suit, made such representations to induce state regulators to approve the ISO Virus or Bacteria Endorsement and to allow the insurance companies to continue to charge the same quantity of premiums. Upon information and belief, the Insurer, and/or its agents, have repudiated representations made in regulatory filings and failed to warn the Teams that they were repudiating such representations.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

107.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

108.    The policies Philadelphia issued to Plaintiffs are valid and enforceable contracts between Plaintiffs and Philadelphia.

109.    As described above, Plaintiffs have sustained, and are continuing to sustain, losses covered under these policies.

110.    Plaintiffs provided prompt notice of their losses, performed all obligations required of them under the respective policies, and were ready, willing, and able to perform their obligations under the policies.

111.    Under the terms of the policies, Philadelphia must pay up to the policies' limits of insurance for Plaintiffs' covered loss, subject only to time limits or deductibles for specific coverages.

112.    Philadelphia has not paid any or all amounts due to Plaintiffs in connection with their claims. Instead, Philadelphia has asserted various inapplicable bases to wrongfully deny coverage for Plaintiffs' claims.

113.    As a direct and proximate result of Philadelphia's breaches of contract, Plaintiffs have suffered and will continue to suffer damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)

114.    Plaintiffs repeat and reallege the allegations set forth in the foregoing paragraphs of this Complaint as if fully set forth herein.

115.    Pursuant to the terms of the Policies, Philadelphia is obligated to pay, up to the limit of liability or any applicable time period, for property damage or business-interruption losses covered under the Policies and not otherwise excluded from coverage.

27

116.    As detailed above, the Teams' losses are covered under multiple coverages of the Policies and are not excluded from coverage.

117.    Philadelphia disputes its legal obligations to pay the Teams' claims.

118.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the Teams are entitled to a declaration by this Court of Philadelphia's obligations under the Policies.

119.    Pursuant to 28 U.S.C. § 2201, this Court should enter a declaratory judgment in favor of the Teams and against Philadelphia, declaring that there is coverage available for the Teams' claims up to the full limits of the Policies and declaring any other relief this Court deems proper.

120.    A declaratory judgment would be useful in resolving this case or controversy. The Teams' losses are ongoing. By clarifying the parties' rights and duties under the Policies, a declaratory judgment would guide Philadelphia's treatment of the Teams' covered but still accruing losses. Because the Teams' unaccrued losses have not yet ripened such that a coercive remedy like damages may not be appropriate, the declaratory judgment claim would afford the Teams relief independent of the breach of contract claims.

## **PRAYER FOR RELIEF**

WHEREFORE, the Teams pray for relief as follows:

(a)    On the First Cause of Action, the Teams request that the Court enter judgment against Philadelphia, awarding the Teams damages in an amount to be determined at trial, but at least $75,000, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

(b)    On the Second Cause of Action, the Teams request that the Court enter a declaratory judgment in favor of the Teams against Philadelphia that the Teams' losses

are covered under the Policies, declaring that Philadelphia is required to pay the Teams, up to the applicable limits of the Policies, for claimed amounts under the Policies;

(c)     For all Causes of Action, all pre-judgment and post-judgment interest as allowed by law and all the Teams' costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees; and

(d)     The Teams request such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

The Teams hereby demand a trial by jury on all issues so triable.

Date:  August 12, 2020                    Respectfully submitted,


*/s/ Andrew L Sandler*
Andrew L Sandler (PA Bar I.D. 40142)       Robin Cohen (*pro hac vice*)
Stephen LeBlanc (*pro hac vice*)           John Briody (*pro hac vice*)
Rebecca Guiterman (*pro hac vice*)         **MCKOOL SMITH, P.C.**
**MITCHELL SANDLER LLC**                   One Manhattan West
1120 20th Street NW, Suite 725             395 9th Avenue, 50th Floor
Washington, DC 20036                       New York, NY 10001
Telephone:   (202) 886-5260                Telephone:     (212) 402-9400
                                           Facsimile:     (212) 402-9444

**Attorneys for Plaintiffs**
                                           Patrick Pijls (*pro hac vice*)
                                           **MCKOOL SMITH, P.C.**
                                           300 Crescent Court, Suite 1500
                                           Dallas, TX 75201
                                           Telephone:     (214) 978-4000
                                           Facsimile:     (214) 978-4044

                                           **Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2020, a copy of the First Amended Complaint was served on the Defendant via this Honorable Court's CM/ECF System upon the following counsel of record:

Jeffrey D. Grossman
Stradley Ronon Stevens & Young LLP
2600 One Commerce Square
Philadelphia, PA 19103

Richard L. Fenton *(Admitted Pro Hac Vice)*
Dentons US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606

Jeffrey A. Zachman *(Admitted Pro Hac Vice)*
Dentons US LLP
303 Peachtree St., NE Suite 5300
Atlanta, GA 30308

**Attorneys for Defendant,**
**Philadelphia Indemnity Insurance Company**

*/s/ Andrew L Sandler*
Andrew L Sandler (PA Bar I.D. 40142)
Stephen LeBlanc (*pro hac vice*)
Rebecca Guiterman (*pro hac vice*)
**MITCHELL SANDLER LLC**
1120 20th Street NW, Suite 725
Washington, DC 20036
Telephone:   (202) 886-5260
Facsimile:     (214) 978-4044

**Attorneys for Plaintiffs**